32 A.3d 456

**CR–RSC TOWER I, LLC, et al.,**

v.

**RSC TOWER I, LLC, et al.**

**Nos. 280, 2535, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Oct. 26, 2011.

Reconsideration Denied Jan. 5, 2012.

312

314

316

Andrew J. Graham (Kramon and Graham, Baltimore, MD and Dale A. Cooter, Cooter, Mangold, Deckelbaum & Karas, LLP, Washington, D.C., on the brief), for appellant.

Brian L. Schwalb (Mitchell Y. Mirviss, Samantha M. Williams, Venable LLP, on the brief), Rockville, MD, for appellee.

Panel: KRAUSER, C.J., EYLER, JAMES R. and GRAEFF, JJ.

EYLER, JAMES R., J.

CR–RSC Tower I, LLC, Second CR–RSC Tower I, LLC, CR–RSC Tower II, LLC, and Second CR–RSC Tower II, LLC, (appellants or CR–RSC), appeal from a judgment entered by the Circuit Court for Montgomery County in favor of RSC Tower I, LLC and RSC Tower II, LLC, (appellees or RSC). The court entered judgment after a jury verdict in favor of appellees, finding breach of two contracts for which appellants were jointly and severally liable and awarding damages for lost profits and expenses incurred in reliance on the contracts. Appellants contend that the circuit court erred in not granting their motion for judgment. In the alternative, appellants contend that the court erred in permitting certain evidence to be introduced, in its instructions to the jury, and in the wording of the verdict sheet. In addition, appellants contend that the court erred in awarding attorneys' fees and costs to appellees.

We conclude that appellants are not jointly and severally liable. Thus, we shall remand to the circuit court with instructions to enter the judgment in favor of RSC Tower I, LLC against CR–RSC Tower I, LLC and Second CR–RSC Tower I, LLC only and the judgment in favor of RSC Tower II against CR–RSC Tower II, LLC and Second CR–RSC Tower II, LLC only. On all other issues, we shall affirm.

## Factual and Procedural Background

Appellants own a 53–acre tract of land in Montgomery County. On June 16, 2004, appellants as landlords entered into two 90–year ground leases with appellees as tenants. Appellees are partially owned and controlled by the Penrose Group, a real estate development company. One lease was for

approximately three acres, and the other lease was for approximately two acres, together with easements to use certain common areas in the rest of the tract. The parties executed a "DECLARATION OF EASEMENTS AND RELATED AGREEMENTS" on June 16, 2004. At that time, the parties contemplated that appellants would develop the portion of the tract not subject to the ground leases. Indeed, in 2003, the owners of the entire tract, appellants' assignors, and Penrose Development Company, LLC entered into a Development Services Agreement pursuant to which Penrose Development Company, LLC agreed to act as a consultant to the owners in connection with development of the tract.

Pursuant to the terms of the ground leases between the parties herein, each appellee agreed to construct an apartment building (hereinafter Tower I and Tower II) on its respective site. After construction and initial rental, the parties contemplated that appellees would sell the buildings. The parties projected that construction on Tower II would begin approximately two years after construction of Tower I. The leases contained provisions obligating the parties to cooperate with each other in the development of the apartment buildings and the rest of the tract.

After executing the leases, in late 2004 and early 2005, the parties modified their agreements to permit development of condominium buildings, a hotel, and spa rather than apartments (the "Canyon Ranch project"). The parties executed several agreements in furtherance of the Canyon Ranch project, but in September 2006, the parties abandoned the project and entered into a termination agreement. Appellees then obtained county approval to revert to the original plan to build apartments. Appellees also arranged financing with Northwestern Mutual Life Insurance Company ("NML") to construct Tower I.

In late September, appellees requested appellants to execute estoppel certificates in which appellants would represent that appellees were not in default under the ground leases. The project's financing terms required that appellees provide

such estoppel certificates and the leases required appellants to execute such certificates to the appellees. Specifically, paragraph 14.6 in both leases provided:

> ***Estoppel Certificate.*** Each party agrees from time to time, upon no less than fifteen (15) days' prior written request of the other, to execute, acknowledge, and deliver to the other a statement in writing certifying (i) that this Lease is unmodified and in full force and effect (or, if there have been any modifications, that the same is in full force and effect as modified and stating the modifications), (ii) the Lease Commencement Date and Fixed Rent Commencement Date, (iii) the then current amount of the Fixed Rent, (iv) the dates to which the Fixed Rent and Additional Rent has been paid, (v) to such party's knowledge, whether there exists any uncured default by the other party and, if so, the nature of such default, and (vi) such other matters relating to this Lease as the party requesting the statement may reasonably require. Any such statement delivered pursuant to this Section 14.6 may be relied upon by any prospective purchaser or mortgagee or any prospective holder of a sublease from Tenant or any prospective assignee of any such holder of a mortgage or sublease.

Appellants disagreed with the language in the proposed certificates. The parties attempted to reach agreement on the language, were unable to do so, and appellants did not execute the certificates. Appellants also initiated proceedings to challenge the county's approval of appellees' site plans and building permits.

On November 8, 2006, appellees filed suit against appellants [1] in the Circuit Court for Montgomery County, alleging that appellants had breached the leases, and seeking declaratory and injunctive relief (the 2006 action), which would require appellants to perform their obligations under the leases. On January 16, 2007, the court issued a preliminary injunction, ordering appellants to deliver executed estoppel certificates to

---

1. Initially, appellees also sued the assignors of appellants, but later dismissed them.

appellees. On January 26, 2007, appellees filed a motion for summary judgment. On April 4, 2007, the court entered summary judgment in favor of appellees. The court, *inter alia*, ruled that appellants breached their obligations under the ground leases; the breaches prohibited appellees from obtaining financing; and appellees could not obtain equity investment or financing without a final order in their favor. The court ordered appellants to specifically perform their obligations under the leases, extended the term and certain due dates in the leases, and suspended payments required by appellees pending the entry of a final non-appealable order. The order included the following paragraph:

> Nothing in this Order prohibits Plaintiffs from pursuing any other remedies or rights they may have, including claims for monetary damages or claims under the Force Majure provision of the Ground Leases, resulting from these or other breaches by Defendants of Plaintiffs' rights and/or the Ground Leases.

On April 16, 2007, appellants delivered estoppel certificates to appellees along with a cover letter reserving all rights under all agreements and all rights that they had asserted in the litigation. Appellees' position was that the certificates did not comply with the terms of the leases, and no one, including lenders, could or would rely on them.

On April 11, 2007, appellants appealed to this Court, arguing that the circuit court had erred in issuing the injunction and in granting summary judgment. In an unreported opinion, this Court affirmed the judgment. *Camalier Limited P'ship v. RSC Tower I*, LLC, No. 2704, September Term 2006 (Md.Ct.Spec.App. Aug. 4, 2008). On September 3, 2008, this Court issued its mandate. After issuance of the mandate, appellants abandoned their challenge to the county approvals of the project.

On September 8, 2008, in the 2006 action, appellees filed an "Amendment by Interlineation of Plaintiffs' Amended Verified Complaint" and a "Motion for Supplemental Relief." In the amendment by interlineation, appellees amended their re-

quests for relief, to include, for the first time, a claim for monetary damages "in an amount no less than $30 million, plus interest" and the costs and expenses of litigation including attorneys' fees, to adjust the terms of the ground leases and certain due dates in the ground leases, and to suspend appellees' payment obligations under the leases pending the obtainment of financing.

In the motion for supplemental relief, appellees, *inter alia,* alleged that the real estate and credit markets had deteriorated subsequent to the April 4, 2007 order and appellees had not been able to obtain financing for the apartment project. In addition, they alleged that Montgomery County no longer considered its prior approvals of the project to be valid. Appellees requested monetary damages and supplemental equitable relief. Appellees' requests tracked the amended requests for relief in the amendment by interlineation. Appellees also asked the court to extend the due dates contained in the leases and to require appellants to pay certain fees and costs while appellees determined whether the project was still viable.

On December 23, 2008, appellants filed a motion to dismiss or, in the alternative, to strike appellees' amendment by interlineation and appellees' motion for supplemental relief. The memorandum in support of that motion is not in the record extract, but we assume that at least one of the grounds argued was that the requested relief was not available procedurally in the 2006 action.

On March 3, 2009, appellees filed a new complaint against appellants in the Circuit Court for Montgomery County (the 2009 action). On December 8, 2009, appellees filed an amended complaint. In their amended complaint, appellees alleged essentially the same facts and sought essentially the same relief as in their amendment by interlineation and motion for supplemental relief previously filed in the 2006 action.

Also on December 8, 2009, appellees filed a motion to consolidate the 2006 and 2009 actions. On February 5, 2010, the court granted that motion.

In late 2009, appellants filed a motion to dismiss the complaint, as amended, in the 2006 action, and a motion to dismiss the amended complaint in the 2009 action. By order docketed on February 5, 2010, the court denied the motions.

On February 16, 2010, appellees filed a motion for leave to file a third amended complaint in the consolidated actions. By order dated March 1, 2010, the court granted the motion. Based on appellants' breach of the lease, before and after April 4, 2007, appellees sought declaratory, injunctive, other equitable relief, and damages. In the third amended complaint, appellees alleged that appellants' continued refusal to execute unconditional estoppel certificates and their efforts to hinder governmental approval of the apartment project constituted continuing or successive breaches of the leases, including breach of the implied covenant of good faith and fair dealing. In addition to other allegations, appellees alleged, for the first time, that each appellee was a third party beneficiary of the other appellee's ground lease and was entitled to enforce it because "its terms are covenants running with the land." Based on that allegation, appellees requested that any monetary judgment be entered against appellants jointly and severally. Appellees requested damages

in an amount no less that $52 million, plus interest, which amount reflects the monetary damages and losses caused by Defendants' breaches of the Ground Leases and resulting interference with Plaintiffs' valuable development rights; to the extent Plaintiffs reasonably determine that it is feasible to re-start and complete the Project, in an amount no less than $63 million to compensate Plaintiffs for the additional costs and additional equity to re-start and complete the Project; or, in an amount not less than $23 million which reflects Plaintiffs' out of pocket expenditures incurred in furtherance of the development of the land and the Project.

Appellees also sought the costs of litigation, including attorneys' fees.

On March 1 through 10, 2010, the case was tried before a jury. In appellees' words:

among other things, [appellees] demonstrated that, in reliance on the ground leases and its bargained-for development rights, [they] had incurred nearly $23 million in out-of-pocket expenses ($16,770,134 in connection with Phase I and $6,226,518 in connection with Phase II). [Appellees] also introduced the contemporaneous financial analyses that it and [NML] had conducted at the time of [appellants'] breaches as to the Apartment Project's projected profits, along with the testimony of real estate experts supporting those financial analyses. Based on that evidence and the testimony of expert forensic accountants, [appellees] argued that [they] had suffered lost profits (after the return of its out-of-pocket expenses) in excess of $28 million ($18,082,103 in Phase I and $10,491,313 in Phase II.)

(Extract and appendix references omitted.)

At the close of appellees' case, appellants moved for judgment in their favor on the grounds that appellees (1) had failed to prove lost profits or reliance damages with reasonable certainty; (2) had failed to prove that any damages were caused by appellants' breach of the leases; (3) had failed to establish third party beneficiary status or any basis for joint and several liability; (4) could not use the implied covenant of good faith and fair dealing to impose additional contract obligations on appellants; and (5) had not introduced any evidence to show that any breaches subsequent to April 4, 2007 had caused damages. The court denied appellants' motion for judgment.

Appellants renewed the motion at the close of all of the evidence. The court reserved on the motion and allowed the case to go to the jury. The jury found that each appellant had breached the ground leases after the court's April 4, 2007 order and that each appellee was entitled to enforce the other's ground lease either as a third party beneficiary or a "third-party entitled to the benefit of a covenant running with the land." The jury awarded damages against appellants in the total amount of $36,350,239.00. On April 9, 2010, after the entry of final judgment, appellants noted an appeal.

In July 2010, appellants filed a request for an award of attorneys' fees and costs. In December 2010, the court granted the motion and awarded $3,654,633.40.

In January 2011, the court denied appellants' motion for judgment, treating it as a motion for judgment notwithstanding the verdict. Appellants filed new notices of appeal.

We shall include additional facts when we discuss the issues.

## Appellants' Contentions

As phrased by us, appellants contend that:

1. The court erred in denying appellants' motion to dismiss and motions for judgment on the ground that (a) monetary damages could not be granted as supplemental relief in the 2006 action, which was concluded by final judgment on the merits when this Court filed its opinion on August 4, 2008, and its mandate on September 3, 2008, and (b) the 2009 action was barred by *res judicata.*

2. The court erred in denying appellants' motions for judgment on the ground that appellees failed to produce legally sufficient evidence that appellants' breaches caused any lost profits damages and failed to produce legally sufficient evidence that appellees sustained lost profits damages with reasonable certainty.

3. The court erred in denying appellants' motions for judgment on the ground that appellees failed to produce legally sufficient evidence that appellants' breaches caused reliance damages.

4. The court erred in denying appellants' motions for judgment with respect to joint and several liability and also erred in submitting a verdict sheet that contained questions relating to joint and several liability.

5. The court erred in evidentiary rulings (a) relating to expert testimony on damages; (b) in permitting bad conduct evidence relating to appellants that predated the April 4, 2007 order and excluding bad conduct evidence relating to appellees; and (c) violating appellants' attorney client privilege.

6. The court erred in its instructions to the jury.

7. If a new trial is ordered by this Court, this Court should order that the case be re-tried before a different trial judge.

8. If this Court reverses the underlying judgment, this Court should reverse the attorneys' fees and costs award on the ground that appellees were not the prevailing party within the meaning of the leases. Additionally, this Court should reverse the award in any event because the court abused its discretion.

## Discussion

### 1. Final Judgment and Preclusion of Issues

Appellants first state that the circuit court erred in denying its motions to dismiss the 2006 and 2009 actions because (a) monetary damages could not be granted as supplemental relief in the 2006 action, which was concluded by final judgment on the merits when we filed our opinion on August 4, 2008, and the mandate on September 3, 2008 and (b) the 2009 action was barred by *res judicata.*

Appellants observe that, in the 2006 action, appellees asked for a declaratory judgment regarding the obligation to provide estoppel certificates but also sought and obtained injunctive relief. Appellants further observe that appellees sought damages, for the first time, in their amendment by interlineation and motion for supplemental relief, both filed in the 2006 action, and in their complaint filed in the 2009 action. They argue that the request in the 2006 action came too late to amend or alter the final judgment and that the request was not further relief within the meaning of the Maryland Declaratory Judgment Act. Maryland Code (2006 Repl. Vol.) § 3–412(a) of the Courts and Judicial Proceedings Article ("C.J.") ("[f]urther relief based on a declaratory judgment or decree may be granted if necessary or proper").

In response, appellees argue that this Court, in a prior unreported opinion in this case, effectively decided that the April 4, 2007 judgment did not bar further relief. *CR–RSC Tower I, LLC v. RSC Tower I, LLC,* No. 1605, September

Term 2009 (Md.Ct.Spec.App. Nov. 10, 2010). That appeal involved an award of attorneys' fees and costs, which appellees obtained after this Court affirmed the April 4, 2007 judgment. Appellants appealed and argued that the claim, based on contract, was barred by the final judgment. In our unreported opinion, we held that the request was proper under C.J. § 3-412. Appellees argue that, based on reasoning similar to that employed by this Court in the unreported attorneys' fees case, appellees' claim for damages in this case was not precluded and the law of the case doctrine applies. Appellees also argue that damages were appropriate as further relief because they were necessary to effectuate the declaratory judgment.

Finally, regardless of whether the earlier judgment barred further relief, appellees argue that the express reservation of rights provision found in the April 4, 2007 judgment entitles them to pursue their damage claim in the 2006 action as further relief and also prevented a res judicata bar of the separate 2009 action.

In reviewing the circuit court's denial of appellants' motions to dismiss, we must examine principles of Maryland law. "[W]here an order [of the trial court] involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175 (2006).

 In Maryland, there are three requirements for res judicata to act as a bar to a subsequent suit: 1) the prior suit must have resulted in a final judgment on the merits; 2) the claim involved in both actions must be substantially the same; and 3) the parties must be the same or in privity. *Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92 (1961). Res judicata will bar all claims that were actually decided in the prior judgment and all claims that could have been decided. *Id.* Res judicata does not apply, however, to claims for further relief, after a

declaratory judgment under C.J. § 3–412(a), if the claim for further relief is proper.

As explained below, with respect to the procedural availability of appellees' damage claims, we decline to rest our decision on the law of the case doctrine. Moreover, Maryland law is unclear as to whether appellees could pursue their action as "further relief" under C.J. § 3–412(a) after entry of the declaratory judgment in the 2006 action. This is because, in the 2006 action, in addition to declaratory relief, appellees sought equitable relief, and the judgment included equitable relief. Nevertheless, regardless of whether the claim for damages is pursued as "further relief" under C.J. § 3–412(a), or whether it is pursued in a separate action, we conclude that appellees' damage claims are not barred because of the express reservation of rights contained in the circuit court's April 4, 2007 order.

### A. *Law of the Case Analysis*

Under the law of the case doctrine, "[o]nce an appellate court has answered a question of law in a given case, the issue is settled for all future proceedings." *Stokes v. American Airlines,* 142 Md.App. 440, 446, 790 A.2d 699 (2002). However, the law of the case doctrine is strictly limited to the specific holding of the earlier case. *See Long v. Burson,* 182 Md.App. 1, 16 n. 8, 957 A.2d 173 (2008).

Here, this Court, in a prior unreported opinion in this case, affirmed the award of litigation expenses to the appellees, awarded after the final judgment entered in September, 2008. *CR–RSC Tower I, LLC v. RSC Tower I, LLC,* No. 1605, September Term, 2009, filed November 10, 2010. We held that the request was proper as "further relief" under C.J. § 3–412.

Appellees now contend that their claim for damages must also be considered "further relief" under C.J. § 3–412 based on the law of the case doctrine. We decline to do so. The claim which was the subject of our prior opinion was a contractual claim for fees and expenses, not a claim for

damages stemming from a continuing breach after the final judgment. While the governing principles may be the same, the holding in that case and the issue presented in this case are not sufficiently similar for the law of the case doctrine to be dispositive.

### B. *"Further Relief" Analysis*

In Maryland, it is unclear whether appellees' claim for monetary damages qualifies as a request for "further relief" under C.J. § 3–412(a) because, although appellees sought a declaratory judgment in the 2006 action, the appellees also sought equitable relief and received all the relief requested. Under Maryland law, the preclusive effect of a declaratory judgment is limited to matters actually raised and decided, not matters which could have been decided. *Bankers and Shippers Ins. Co. of New York v. Electro Enterprises, Inc.,* 287 Md. 641, 653, 415 A.2d 278 (1980). Res adjudicata does not apply, however, when a plaintiff properly requests further relief, after a declaration of rights under C.J. § 3–412. *Id.See also Nova Research, Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 458–461, 952 A.2d 275 (2008) (discussing C.J. § 3–412 generally). A subsequent claim is not barred due to an earlier declaratory judgment as to the rights of the parties because declaratory relief is viewed as a judicial declaration of the relationship between the parties, not the enforcement of any claim. *Bankers,* 287 Md. at 653, 415 A.2d 278.

The Court in *Bankers* explicitly declined to decide the preclusive effect of a declaratory judgment, however, when the original request also included a claim for "coercive or other relief." *Id.* at 655 n. 6, 415 A.2d 278. Courts have differed on whether a request for further relief should be allowed when the earlier declaratory judgment also included a request for injunctive or other equitable relief. *Id.* (listing cases). *Compare Swanson v. Tearney,* 87 Cal.App.2d 191, 195, 196 P.2d 49 (1948) (holding that plaintiff was barred from seeking further damages when the original action was for both declaratory and injunctive relief) *with Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co.,* 255 F.2d 518, 522 (2d Cir.1958) (holding that the plaintiff was entitled to seek dam-

ages under a federal statute identical to C.J. § 3–412(a) even though the original request was for both declaratory and injunctive relief). Applying Maryland law under diversity jurisdiction, the United States Court of Appeals for the Fourth Circuit held, consistent with other federal courts, that the declaratory judgment exception to the res judicata doctrine did not apply when the prior action sought both declaratory and injunctive relief. *Laurel Sand & Gravel, Inc. v. Wilson,* 519 F.3d 156, 164 (4th Cir.2008). *See also Brannock Assoc., Inc. v. Capitol 801 Corp.,* 807 F.Supp. 127, 134–35 (D.D.C.1992) (holding that the federal declaratory judgment act did not apply and res judicata barred a damages claim where plaintiff sought both declaratory and coercive relief in the earlier declaratory judgment action).

It is unnecessary for us to decide this issue because the express reservation in the earlier judgment prevents a res judicata bar, regardless of whether the damages claim would otherwise qualify as further relief under C.J. § 3–412(a).

### C. *Express Reservation Analysis*

█ Regardless of whether the claim for damages can be considered further relief under C.J. § 3–412(a), the express reservation provision in the earlier judgment prevents a res judicata bar, whether in the form of further relief in the declaratory action or in a separate action. Res judicata will not act as a bar when a court expressly reserves the plaintiff's right to pursue a second action. Restatement (Second) of Judgments § 26(1)(B) (1982); 18 Charles A. Wright, Federal Practice and Procedure § 4413 (1981) ("A judgment that expressly leaves open the opportunity to bring a second action on specified parts of the claim or cause of action that was advanced in the first action should be effective to forestall preclusion."). *See, e.g., King v. Provident Life & Accident Ins. Co.,* 23 F.3d 926 (5th Cir.1994) (holding that a second claim was not barred under res judicata when the original judge stated that "plaintiffs, of course, retain the right to file another lawsuit"); *Perroncello v. Donahue,* 64 Mass.App.Ct. 564, 570, 835 N.E.2d 256 (2005) (rejecting argument that offer of judgment for specific performance precluded a subsequent

action for breach of contract damages when the judge stated in his order that "the remaining counts and counterclaims here shall survive, specifically allowing the parties to pursue money damages against each other") *superseded on other grounds by Perroncello v. Donahue*, 448 Mass. 199, 859 N.E.2d 827 (2007). Generally, when a court expressly reserves a plaintiff's rights, it does so by noting that its judgment is "without prejudice," or using similar words to that effect. Restatement (Second) of Judgments § 26(1)(b) cmt. b (1982).

Here, the circuit court did not err in denying appellants' motions to dismiss. The trial court's reservation in its declaratory judgment allowed for the award of monetary damages as further relief in the 2006 action and prevented the application of res judicata to the 2009 action. In its final order on April 4, 2007, the circuit court expressly reserved appellees' rights to bring an action for damages. The circuit court's April 4, 2007 order included the following paragraph:

> Nothing in this Order prohibits Plaintiffs from pursuing any other remedies or rights they may have, including claims for monetary damages or claims under the Force Majeure provision of the Ground Leases, resulting from these or other breaches by Defendants of Plaintiffs' rights and/or the Ground Leases.

This express reservation of rights in the original judgment allowed appellees to pursue a request for monetary damages caused by appellants' initial failure to supply the estoppel certificates as well as for any continuing or subsequent breach. Therefore, this express reservation allowed appellees to pursue "further relief" in the 2006 action and also prevented res judicata from barring the 2009 action. It should be noted, however, that principles of collateral estoppel apply, and matters finally litigated could not be re-litigated.

### 2. Sufficiency of Evidence for Lost Profits caused by appellants' breach(es)

Appellants allege that the circuit court erred in denying their motions for judgment because the evidence was legally

insufficient to support a finding of lost profits caused by their breaches. During trial, appellees relied heavily upon real estate projections made in 2006 in order to prove damages. Gregory Leisch, a real estate consultant, opined that the 2006 projections made for Tower I and Tower II were reasonable when made. Had the project gone forward as planned, he opined that Tower I would have been stable, or fully leased, by December, 2010, and Tower II would have been stable, or fully leased, by December, 2012. He testified that the units in Tower I would have rented at $2.85 per square foot, and a parking space would have rented at $130.00 per month. Mr. Leisch also opined that the unit would have had a 4% vacancy rate, and that rental rates would increase 3% per year over a ten year period following completion of construction and rental. He expressed an opinion as to the same issues with respect to Tower II but the numbers were higher, reflecting the fact that it was projected to be finished two years after completion of Tower I.

Mr. Leisch explained that in order to determine the value of a rental building, a preferred method is to capitalize projected income. He expressed his opinion that a conservative capitalization rate for Tower I was 6 percent at the beginning of construction and 6.5 percent at completion. Mr. Leisch opined that a conservative capitalization rate for Tower II was 6.5 percent at the beginning of construction and 7 percent at completion.

Wiley Wright, an accountant, testified as an expert and, based on Mr. Leisch's testimony, expressed his opinion as to the market value of Tower I at the end of 2010 and Tower II at the end of 2012. Mr. Wright then subtracted the projected development costs and estimated costs of sale to determine the amount of lost profits, assuming the buildings had been completed, stabilized, and sold. Appellees claimed lost profits in a total amount of $34,852,137.00 for Tower I and $16,717,831.00 for Tower II.

Under Maryland law, in order to recover lost profits damages, a plaintiff must show that (1) the breach by the

defendant was the proximate cause of the plaintiff's loss; (2) the defendant could reasonably foresee that a loss of profits would result from the breach; and (3) the amount of lost profits can be proved with reasonable certainty. *M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 346, 138 A.2d 350 (1958). Appellants contest the elements of proximate causation and reasonable certainty for lost profits damages. We address both of these elements below.

As noted above, in reviewing the denial of a motion for judgment or judgment notwithstanding the verdict, we review questions of law *de novo*. *Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175 (2006). For questions of fact, we must affirm the trial court and uphold the jury's verdict as long as it is supported by legally sufficient evidence. Evidence is legally sufficient if there is "some evidence, including all inferences that may permissibly be drawn therefrom, that, if believed and if given maximum weight, could logically establish all the elements necessary to prove" plaintiff's case. *Starke v. Starke,* 134 Md.App. 663, 678–79, 761 A.2d 355 (2000).

## A. *Proximate Causation*

Appellants claim that appellees failed to prove at trial that any breaches by appellants caused any damages. First, appellants assert that appellees intended to create a new entity, Sorrento, to construct the apartment buildings and that Sorrento was the proper plaintiff rather than appellees. Second, appellants argue that the evidence was insufficient to support a finding that the failure of financing caused any loss because 1) appellants already had obtained financing through another entity; 2) other conditions precedent to financing had not been fulfilled; and 3) appellees could have constructed the development without outside financing.

### 1. Wrong Entity

First, appellants allege that appellees did not sufficiently prove proximate causation because the real damaged party

was Sorrento, an un-formed entity that was to eventually construct the apartment buildings. We disagree.

The fact that appellees may have subsequently assigned their interest in the ground leases to a new entity if the financing had in fact occurred does not negate causation as a matter of law for breach of contract damages. The Memorandum of Understanding entered into between NML and appellees regarding financing for the project contemplated that the venture would either move forward by "forming" a new entity, Sorrento, or by purchasing an existing company. The loan commitment provided RSC the right to assign the loan commitment to another entity; it did not require it to do so. The loan commitment, signed by Olav Kollevoll as RSC's representative, identified Sorrento as an entity "in the process of being formed by RSC." Appellees held the interest in the ground leases, had obtained financing and county approvals, and had incurred significant expenses. The fact that appellees may have intended to form another entity, to serve as assignee had no breach occurred, does not change the fact that appellees were parties to the contracts and sustained damages caused by appellants' breach(es). The continuing nature of the initial breach prevented pursuit of the project. Furthermore, the declaratory judgment entered on April 4, 2007, affirmed on appeal, identified appellees as the damaged parties. It is too late to re-litigate this issue.

### 2. Failure of Financing

Next, appellants argue that appellees did not sufficiently establish that appellants' breach prevented the project from going forward. First, appellants argue that the evidence was insufficient to support a finding that the failure to obtain financing from NML directly caused any loss because appellants already had sufficient financing through Wachovia Bank. Second, appellants claim that there was no proximate causation because there were other unfulfilled conditions precedent to obtaining financing in addition to the failure to provide the estoppel certificates. Finally, appellants claim that appellees

and their principals could have financed the project without obtaining financing from other sources.

Appellants argue that in the fall of 2006 there was a construction loan in place with Wachovia Bank as the lender that was sufficient to construct Tower I without any additional financing from NML, and therefore, the project could have been completed regardless of appellants' breaches. However, evidence introduced at trial supported a contrary conclusion. Appellees produced evidence that, at the time of the breach in late 2006, appellees had a maximum of $62.5 million available through the Wachovia loan, but the cost at that time to complete Tower I was approximately $92.3 million. Furthermore, Mr. Kollevoll testified that, even if appellees pursued financing solely through Wachovia Bank, appellants still would have had to provide the contested estoppel certificates. In fact, according to Mr. Kollevoll, the estoppel certificates were initially requested for Wachovia Bank. There was evidence to support a conclusion that appellants' failure to provide estoppel certificates proximately caused the failure of financing to enable the project to go forward.

Next, appellants argue that appellees did not establish proximate causation because appellees did not fulfill additional conditions precedent to financing other than not providing the estoppel certificates. Under Maryland law, the element of proximate causation for breach of contract lost profit damages is satisfied when the breach "was a substantial factor in causing the loss." *Hoang v. Hewitt Ave. Assocs.*, 177 Md.App. 562, 607, 936 A.2d 915 (2007) (citing *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1339 (Fed.Cir.2003) and *Scott Timber Co. v. United States*, 64 Fed.Cl. 130, 137–38 (2005)). Here, Nicholas Jahnke, testifying as a representative for NML, specifically testified that appellants' refusal to provide estoppel certificates and the subsequent reservation of rights on the estoppel certificates brought the financing effort to a halt. Thus, a jury could find that the failure to provide estoppel certificates was a substantial factor in the failure to obtain financing to fund the project.

Finally, appellants argue that the failure of financing was not a proximate cause of appellees' damages because appellees could have financed the construction of the project through its investors rather than through a financing company. Specifically, appellants claim that appellees could have completed construction of the project by making a "cash call" on investors such as the Kadan family. Mr. Kollevoll testified at trial, however, that at the relevant time, the Kadans wanted out of the business deal. He testified that if appellees had attempted to make a cash call against them, there was no method for appellees to actually obtain the money if the family was unwilling to provide it. Furthermore, appellants never established that the family actually had the financial resources to finance construction of the buildings. The evidence presented at trial was legally sufficient for a jury to find that appellants' breach caused appellees' damages.

### B. *Reasonable Certainty*

Appellants charge that the evidence presented at trial was not legally sufficient to prove lost profits damages with reasonable certainty. Appellants argue that 1) the circuit court erred in excluding evidence of post-breach actual market conditions and 2) appellees' December 2006 market projections were too speculative to support an award, particularly because the claims were based on collateral, and not direct, lost profits.

### 1. Post–Breach Market Conditions

██ As mentioned above, appellees' claim for lost profits was based on market projections as of December 2006, the time of appellants' initial breach. While this case was on appeal to this Court from the summary judgment entered in the 2006 action, the real estate market deteriorated significantly, thus making the project unfeasible. Before trial in early 2010, appellees moved in limine to exclude evidence of post-breach actual market conditions, and the court granted it. In opposition to the motion, appellants argued that because Tower I was projected to not be fully leased until 2010 and Tower II was projected to not be fully leased until 2012, actual

market conditions in that time frame were relevant and would show that, had the apartment buildings been built as planned, appellees would not have made a profit because of changed market conditions. Appellees reasoned that the law provides that damages are measured as of the time of breach, and therefore, evidence of post-breach market conditions was inadmissible.

"[T]he admission of evidence is committed to the considerable and sound discretion of the trial court." *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432 (1997). In reviewing a motion in limine, "we are generally loath to reverse a trial court" unless the evidence was plainly improperly admitted or excluded under law, "or there is a clear showing of an abuse of discretion." *Id.* at 404–405, 697 A.2d 432.

Damages for breach of contract generally include "expectancy" damages. The traditional rule is that expectancy damages, which include lost profits, are measured at the time of the breach. *Republic Ins. Co. v. Prince George's County,* 92 Md.App. 528, 533, 608 A.2d 1301 (1992) (citation and internal quotations omitted). *See also Beard v. S/E Joint Venture,* 321 Md. 126, 141, 581 A.2d 1275 (1990) ("[a]s we have seen, the ordinary rule for computing loss of the bargain damages is to value the property at the time of breach"). Frequently, later events such as "fluctuations in value after the breach" are irrelevant for damage determinations. *Republic Ins. Co.,* 92 Md.App. at 533, 608 A.2d 1301.

While the Court of Appeals has stated and applied the general rule, there are very few appellate cases in Maryland in which the Courts have applied the general rule to claims for direct lost profits, when the issue was contested, and seemingly none that have applied it to claims for collateral lost profits. Direct lost profits result "immediately from the performance of the contract broken." *M & R Contractors & Builders v. Michael, supra,* (quoting Corbin, Contracts, § 1020 (1951)). Collateral lost profits result from the loss of "other contracts collateral to the one broken," to which the

defendant was not a party. *Id.* In *M & R Contractors,* the Court of Appeals stated that the plaintiff's direct lost profits damages for a breach of contract should be measured "under the circumstances that existed at the time of the breach." *Id.* at 349, 138 A.2d 350 (quoting Corbin, Contracts, § 1094 (1951)). *M & R Contractors* favorably cited a leading American case on lost profits damages, *Masterton v. Mayor of Brooklyn,* in which the court held that lost profits "damages are to be settled and ascertained according to the existing state of the market at the time the cause of action arose, and not at the time fixed for full performance." 7 Hill 61, 71 (N.Y.Sup.Ct.1845).

A possible explanation as to why there are no Maryland cases which address whether the traditional rule measuring contract damages at the time of the breach should apply to collateral lost profits cases is because, until relatively recently, collateral lost profits damages were considered too speculative to be awarded. The Court of Appeals and this Court first approved the recovery of collateral lost profits damages in the late 1970s, and then only in cases in which the plaintiff proved that collateral contracts had already been entered into at the time of the breach. *See Impala Platinum, Ltd. v. Impala Sales, Inc.,* 283 Md. 296, 389 A.2d 887 (1978); *John D. Copanos & Sons, Inc. v. McDade Rigging & Steel Erection Co.,* 43 Md.App. 204, 403 A.2d 402 (1979); *Sergeant Co. v. Clifton Building Corp.,* 47 Md.App. 307, 423 A.2d 257 (1981). *See also Hoang v. Hewitt Ave. Assocs.,* 177 Md.App. 562, 597–604, 936 A.2d 915 (2007) (discussing the history of collateral lost profits damages cases in Maryland).

Only in 2007 did this Court first uphold an award of collateral lost profits damages in a case in which there were no existing collateral contracts at the time of breach. *See Hoang,* 177 Md.App. at 609, 936 A.2d 915 (stating that "[t]he cases do not hold, however, that such evidence is necessary to the recovery of collateral lost profits, *i.e.,* that without evidence of third party contracts in hand when the contract at issue is made, collateral lost profits are not recoverable"). *Hoang* involved a breach of contract for the sale of real estate. In

*Hoang*, the use or non-use of post-breach market conditions was not addressed, but this Court referred to expert testimony regarding "the prices the finished town houses would have fetched on the real estate market as it existed at the relevant time" helped prove collateral lost profits damages with reasonable certainty. *Id.* at 610–11, 936 A.2d 915. That expert testified on the basis of projections of the real estate market, as the trial took place in 2004 and early 2005 and the town houses were not slated to be completed until the summer of 2007. *Id.* at 571, 936 A.2d 915. Thus, the Court of Appeals and this Court have not directly addressed whether it is proper to award collateral lost profits damages on the basis of otherwise reasonable projections at the time of the breach without consideration of post breach market conditions.

Other jurisdictions have differed on whether lost profit contract damages should be measured at the time of the breach. The Supreme Court touched on this issue in a breach of contract action for failure to execute applications for a patent. *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697–98, 53 S.Ct. 736, 77 L.Ed. 1449 (1933). The Court noted that determining the market value for a patent at the time of breach is difficult because "[a] patent is a thing unique." *Id.* at 697, 53 S.Ct. 736. Instead, the Court reasoned that in order to determine the value of the patent at the time of the breach, and thus to determine damages, experts can testify based on the "state of the art, the character of the improvement, and the probable increase of efficiency or saving of expense" if "the trial follows quickly after the issue of the patent." *Id.* at 698, 53 S.Ct. 736. The Court went on to say that "a different situation is presented if years have gone by before the evidence is offered." In that case, the Court reasoned that "[e]xperience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Id.* at 698, 53 S.Ct. 736. The Court explained that "[t]o correct uncertain prophecies in [breach of contract or tort cases] is not to charge the offender with elements of value non-existent at the time of his

offense" but rather "it is to bring out and expose to light the elements of value that were there from the beginning." *Id.* *See also Advent Sys. Ltd. v. Unisys Corp.,* 925 F.2d 670 (3rd Cir.1991) (holding that lost profits damages were not established with reasonable certainty when a damages expert testified, after the damages period had expired, as to projections made at the time of the breach that were significantly higher than actual market value during the period in question); *Sun Ins. Marketing Network, Inc. v. AIG Life Insurance Co.,* 254 F.Supp.2d 1239 (M.D.Fla.2003) (actual market conditions should be considered when the time period during which damages were projected had already expired).

In contrast, the United States Court of Appeals for the District of Columbia Circuit held that evidence of favorable post-breach market conditions is inadmissible to show increased direct lost profits. *J.D. Hedin Constr. Co. v. F.S. Bowen Elec. Co.,* 273 F.2d 511, 513 (D.C.Cir.1960). *J.D. Hedin* concerned the breach of a sub-contract under a construction contract. *Id.* The trial court admitted plaintiff's evidence of post-breach market conditions that showed increased lost profits due to diminished costs of performance. *Id.* The United States Circuit Court of Appeals for the District of Columbia found that the trial court committed reversible error because "[s]uch costs are to be estimated as nearly as may be according to 'the circumstances that existed at the time of breach'" and should not reflect "events which occurred after the contract was executed, and after its breach." *Id.* (citing Corbin, Contracts, § 1094 (1951)).

Similarly, the Arizona Court of Appeals upheld a finding of lost profits for a development project based upon projections made at the time of the breach. *Rhue v. Dawson,* 173 Ariz. 220, 841 P.2d 215 (Ariz.Ct.App.1992). *Rhue* concerned a partnership dispute where the defendant attempted to introduce evidence that the real estate market deteriorated after his breach in order to show that he should not have to pay the value of partnership property at the time of the breach. *Id.* at 230, 841 P.2d 215. The Court in *Rhue* specifically held that the fact that the real estate market deteriorated after the

defendant's breach was irrelevant and violated the "general contract rule" that measures damages at the time of the breach. *Id.* The Court stated that measuring damages at the date of the breach is "sound policy" because "[t]he adverse consequences of a controlling partner's delays and decisions which prevent the partnership from realizing the profits should be at that partner's risk, not at the risk of the ousted, innocent partner." *Id.* at 230–31, 841 P.2d 215.

Citing 22 Am.Jur.2d Damages § 78 (2011), appellants argue that the general rule that contract damages are measured at the time of the breach does not apply to "anticipated profits or to other expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the contract." We note that the case cited in Am.Jur. for that proposition, *Energy Capital Corp. v. United States,* merely reduced to present value the damages that would have arisen after the date of judgment ("future lost profits"). 302 F.3d 1314, 1330 (Fed.Cir.2002). The Court did not apply this principle to hold that the amount of lost profits should be determined by market value at some date later than at the time of the breach.

However, citing *Energy Capital Corp.,* the United States Court of Appeals for the Federal Circuit recently held that the trial court did not abuse its discretion by considering post-breach evidence in order to determine direct lost profits damages. *Anchor Sav. Bank, FSB v. United States,* 597 F.3d 1356 (Fed.Cir.2010). The Court in *Anchor,* citing and relying upon other Federal Circuit decisions, reasoned that the general rule favoring the measurement of damages at the time of the breach should not apply to profits that would have accrued over the course of a contract because it "may not result in the most accurate assessment of expectancy damages." *Id.* at 1369 (quoting *Fifth Third Bank v. United States,* 518 F.3d 1368, 1377 (Fed.Cir.2008)). In that case, the plaintiffs recovered damages based on the sale of assets it otherwise would not have sold but for the defendants' breach. The assets would have accrued profits over time, so the Court admitted post-breach evidence to determine the amount of lost profits.

The Court stated that a court can consider post-breach evidence "in order to place the non-breaching party in as good a position as he would have been had the contract been performed." *Id.* at 1370 (quoting *Fifth Third Bank v. United States*, 518 F.3d 1368, 1377 (Fed.Cir.2008)).

Maryland cases have been consistent with the principle set forth in Am.Jur., although they do not cite to it directly. The Court of Appeals in *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 492, 270 A.2d 645 (1970), stated that actual experience after the breach could be used in measuring direct lost profits. In *Macke Co.*, on December 30, 1966, Macke Co. placed vending machines at certain locations pursuant to contracts with an automatically renewable term of one year. The owner of the premises was to be paid a percentage of gross revenue realized from the machines. In January and February, 1968, the owner of the premises terminated the contracts. *Id.* at 481, 270 A.2d 645. Macke Co. sued for breach of contract. *Id.* The trial court found that the owners breached the contracts but that Macke Co. failed to prove damages with reasonable certainty. *Id.* at 482, 270 A.2d 645. At trial, Macke Co. had attempted to prove damages by putting in evidence gross sales figures for the month of January, 1968 at the locations in question. *Id.* at 489–490, 270 A.2d 645. Even though an extrapolation for the rest of 1968 was in existence, Macke Co. did not introduce any evidence projecting losses for the rest of 1968. *Id.* at 490, 270 A.2d 645. Macke Co. also called one of the defendants to testify, who stated that he received a certain amount of money from the machines in 1967. *Id.* Based on that testimony, Macke Co. submitted to the court an extrapolation of 1967 figures to show a projection of profits lost in 1968. *Id.* The Court concluded that the trial court erred when it concluded that damages could not be proved and remanded for the trial court to reconsider the issue of damages. *Id.* at 491, 270 A.2d 645. The Court stated that instead of relying on the two varying projections based on past performance in 1967 and January 1968, the trial court could consider whether the defendants had obtained other vending machines, and if so, it could

consider the actual experience with those machines during 1968. *Id.* at 492, 270 A.2d 645. The Court noted that the defendants' actual earnings during the time period in question would be a "more appropriate measure of damages" than the projections, particularly in light of evidence that factors potentially affecting the vending machines' earnings had changed from 1967 to 1968. *Id.*

Similarly, in *Fowler v. Printers II, Inc.,* this Court advocated the use of actual experience during the post-breach period when projections based on past profits for the business were too speculative. 89 Md.App. 448, 598 A.2d 794 (1991). In *Fowler,* the appellant-defendant had breached a restrictive covenant with her old employer by using her business contacts with a new company. *Id.* at 458, 598 A.2d 794. In order to prove the damages incurred by the old employer, the appellee-plaintiff presented evidence of lost profits for the accounts which followed the defendant to her new company. *Id.* at 473, 598 A.2d 794. Specifically, the plaintiff presented evidence of profits gained by the new company from the accounts in 1990 rather than basing damages on profits gained by the old company from the accounts in 1989. *Id.* at 476, 598 A.2d 794. This Court upheld the use of these figures, reasoning that the evidence of profits earned by the old company in 1989 would be too speculative, particularly in light of "substantial evidence" that several independent factors may have resulted in a decrease in the plaintiff's business in 1990. *Id.* at 476–77, 598 A.2d 794.

In both *Macke* and *Fowler,* the Court determined that using past profits of the business for the damages period would be speculative because of evidence that factors affecting profits during that period may have changed significantly from the past. The Court then allowed the parties to present post-breach evidence of lost profits based on profits made by others related to the contract. However, both cases are distinguishable from this case. The claimed lost profits in *Macke* and *Fowler,* and the other cases cited above in support of the statement in Am.Jur. § 78, would have been ongoing over the course of the contract, absent the breach. Here, the non-

breaching parties were not operating businesses which were expected to produce profits on an ongoing periodic basis over the course of the contract. Instead, appellees claimed profits that would have accrued once: on sale after the apartments had stabilized. In addition, in those cases there was actual substituted performance. Here, the buildings were not constructed.

Under the current state of Maryland law, the general principle is that breach of contract damages are measured at the time of the breach. We see no distinction, relevant to this issue, between direct and collateral lost profits. Thus, the circuit court did not abuse its discretion in barring evidence of post-breach market conditions.

### 2. Reasonable Certainty of the 2006 Damage Projections

Even if evidence of post-breach market conditions was properly excluded, appellants claim that the 2006 damage projections used to determine lost profits were legally insufficient to prove damages with reasonable certainty. Appellants argue that it was pure speculation whether Tower I would be constructed, leased, and sold.

In addition to the requirements that damages must be both foreseeable and proximately caused by the breach, damages must also be established at trial with reasonable certainty. Reasonable certainty means that evidence must demonstrate "the likelihood of damages being incurred as a consequence of the breach, and their probable amount." *Hoang v. Hewitt Ave. Assocs.*, 177 Md.App. 562, 595, 936 A.2d 915 (2007). The standard for proving "reasonable certainty" depends upon the type of lost profits damages being sought: direct or collateral. Proving collateral lost profits damages with reasonable certainty is more difficult than proving direct lost profits because the legal standard is strictly applied, *id.* at 610, 936 A.2d 915, and collateral lost profits may be considered too "speculative, hypothetical, remote, or contingent either in eventuality or amount." *Id.* at 595, 936 A.2d 915. However, the fact that "more stringent proof is required where the

anticipated profits stem from collateral transactions does not warrant a prohibition on such proof." *John D. Copanos & Sons, Inc. v. McDade Rigging & Steel Erection Co.*, 43 Md.App. 204, 210, 403 A.2d 402 (1979).

This Court recently examined the case law behind collateral lost profits damages in *Hoang*, which involved a breach of contract for the sale of real estate. We held that collateral lost profits were proved at trial with reasonable certainty even though the development was in the "planning stage" and there were not yet any "collateral re-sale contracts from which its profits would be generated." *Id.* at 608, 936 A.2d 915. We based our decision partly on the fact that the non-breaching party had a very strong reputation for the prior 25 years for developing successful residential properties in the community. *Id.* at 609, 936 A.2d 915. In *Hoang*, the actual amount of damages was proved with reasonable certainty because the non-breaching party presented expert testimony about the costs incurred as well as projections regarding the probability of sale of the town houses, the prices of the finished townhouses "at the relevant time," and the profit that would have been returned to it. *Id.* at 610, 936 A.2d 915. *See also Lanahan v. Heaver*, 79 Md. 413, 29 A. 1036 (1894) (reversing a judgment for collateral lost profits damages because plaintiffs did not show "a particle of evidence" regarding the projected price or market value of the homes involved in the breach of contract); *John D. Copanos & Sons, Inc.*, 43 Md.App. at 208, 403 A.2d 402 (holding that collateral lost profit damages were proved with reasonable certainty when the non-breaching party was an "established firm embarking on a new method of manufacture").

The evidence of collateral lost profit damages in this case was sufficient to create a jury question. Similar to the non-breaching party in *Hoang*, Penrose Group, appellees' parent company, is a successful real estate development company that has developed a variety of different buildings in Montgomery County for over 20 years. Floyd E. Davis III, president of one of the original landlord entities in the ground leases who testified on behalf of appellants at trial, admitted that appel-

lants decided to partner with Penrose as a development company because it had an excellent reputation. Mr. Wright used a "stabilized pro forma" model to project profits for the Tower I building in 2010, the first year it was expected to be fully leased. Mr. Wright's findings were corroborated by the testimony and findings of Gregory Leisch, a real estate expert, as well as Nicholas Jahnke, representative of NML, who authorized a financing commitment to the project on the basis of the same pro forma projections. This case falls within *Hoang's* purview; thus, the evidence below was sufficient to support a finding that appellees proved collateral lost profit damages with reasonable certainty.

### 3. Sufficiency of Evidence for Reliance Damages

Next, appellants claim, in various parts of their brief, that appellees failed to establish sufficient evidence to sustain a damages award for Tower II based upon either lost profits or costs incurred in reliance on the contracts. As to reliance damages, appellants argue that reliance damages for Tower II were too speculative because it was speculative whether appellees would have ever been able to recoup the costs expended on the project.

The circuit court denied appellants' motion for judgment, in which appellants asserted that appellees did not sufficiently prove damages at trial. In reviewing the denial of a motion for judgment or judgment notwithstanding the verdict, we review questions of law *de novo*. *Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175 (2006). For questions of fact, we must affirm the trial court and uphold the jury's verdict as long as it is supported by legally sufficient evidence. Evidence is legally sufficient if there is "some evidence, including all inferences that may permissibly be drawn therefrom, that, if believed and if given maximum weight, could logically establish all the elements necessary to prove" plaintiff's case. *Starke v. Starke*, 134 Md.App. 663, 678–79, 761 A.2d 355 (2000).

### A. Tower II: Lost Profits or Reliance Damages?

Before addressing the question of the sufficiency of the evidence for Tower II damages, it is necessary to determine

what type of damages were awarded: lost profits or reliance. Based upon the amount awarded, appellants take the position in their brief that the jury awarded lost profits for Tower I. Appellants then focus at length on the asserted failure to prove reliance damages for Tower II.

When a general verdict is returned without any mention of the theory of recovery relied upon, this Court must affirm a favorable verdict for the plaintiff if any theory of recovery was supported by legally sufficient evidence and there was no other reversible error. "It is counsel's responsibility to assure that all critical issues are submitted to the jury." *Edwards v. Gramling Eng'g Corp.*, 322 Md. 535, 549–50, 588 A.2d 793 (1991) (noting that a party "may not, at this late date, bemoan the imprecise language of the special verdict"). In this case, appellants did not request a special verdict distinguishing between reliance and lost profits damages. Therefore, if there is legally sufficient evidence to support an award for Tower II based upon either reliance or lost profits, and there is no other reversible error, this Court must affirm the judgment.

B. *Sufficiency of the Evidence*

Appellees presented sufficient evidence at trial to prove reliance damages for Tower II. Under Maryland law, a party may recover for "expenditures made in reliance on a contract but not strictly in part performance of it, or as necessary preparation for performance." *Dialist Co. v. Pulford*, 42 Md.App. 173, 180, 399 A.2d 1374 (1979). Reliance damages may be awarded if, at the time of the contract, it was reasonably foreseeable to the defendant that such expenditures would be made and that the defendant's breach would prevent reimbursement. *Id.* at 181, 399 A.2d 1374 (citing Corbin, Contracts, § 1035 (1964)). "The award of a party's reliance interest as a measure of damages may serve as an alternative to the ordinary award of his expectation interest. This alternative may be employed when the available evidence relevant to anticipated profits permits no more than a speculative estimate as to their amount." *Id.* at 181, 399 A.2d 1374.

Thus, we will examine three related questions in this section: (1) whether the damages award only includes expenditures made in reliance on the ground leases; (2) whether it was reasonably foreseeable to appellants that such expenditures would be made; and (3) whether the actual amount of damages was sufficiently proven at trial.

### 1. Reliance

Appellants argue that, for a large portion of the expenses, appellees presented no evidence that the expenses were incurred in reliance on the leases, as opposed to reliance on the earlier development services agreement and the Canyon Ranch hotel condominium project documents. Appellants also argue that appellees cannot recover reliance damages because appellees wrongfully continued to make expenditures after learning of the breach.

First, appellants argue that the evidence presented was not legally sufficient because some of the evidence admitted dealt with expenses incurred before either lease was signed. Although the relevance of those costs for the purpose of reliance damages is questionable because a party may only recover reliance damages for expenditures made after a contract is entered into, appellants should have objected to the evidence's admission at trial on that basis rather than argue that its admission makes the totality of evidence of reliance legally insufficient.

Second, appellants dispute the award of reliance damages for Tower II because the damages included reimbursement of expenditures made towards the Canyon Ranch project that appellants claim could not have been made in reliance on the ground leases. There was evidence that all parties agreed to pursue the Canyon Ranch project, however. There was also evidence presented at trial that appellees relied upon the ground leases when pursuing the Canyon Ranch project. Olav Kollevoll, a representative of appellees, testified at trial that he would not have pursued the Canyon Ranch Project if the ground leases were not in effect. Mr. Kollevoll testified that

he believed that if the Canyon Ranch project was not success-ful, appellees would have recouped the expenditures made by developing the property as apartments through the ground leases.

Finally, appellants maintain that appellees cannot recover reliance damages for expenses incurred after the 2006 breach because appellees incurred additional expenses after knowing of the breach of contract. Generally, reliance dam-ages cannot be recovered for expenditures made after a non-defaulting party's awareness of the breach. *Dialist,* 42 Md. App. at 185, 399 A.2d 1374. However, in *Dialist* we held that a party can recover expenses made after the breach if, at the time, "it was possible that [the parties'] differences would be resolved." *Id.* Here, appellees originally sought a declaratory judgment and injunctive relief so that they could go forward with the apartment project. Evidence indicated that, after declaratory judgment was entered in April 2007, RSC's build-ing permit was still valid and the financing projections were still sound. Thus, it was still possible for the apartment project to move forward as planned. Appellees were entitled to pursue relief for these reliance damages.

## 2. Foreseeability

Appellants dispute the award of reliance damages on the basis of a lack of foreseeability. Appellants claim that appellees did not prove that appellants had reason to foresee that appellees would rely upon the ground leases by making expenditures towards the Canyon Ranch Project. However, Mr. Davis testified on behalf of appellants that when the parties executed the Canyon Ranch sales contracts in Septem-ber 2005, the parties also amended the ground leases to state that the ground leases would remain in full force until the Canyon Ranch sales contracts closed. The parties also amended the ground leases to extend the time period for the construction of the apartment buildings in order to accommo-date the Canyon Ranch deal. Mr. Davis further testified that appellees were willing to proceed with the necessary expendi-tures on the Canyon Ranch deal because they would still be

able to enforce the ground leases under the September amendments. Appellees relied upon the modification of the original ground lease contracts in making expenditures towards the Canyon Ranch deal. Thus, appellees presented sufficient evidence at trial to support the jury's verdict that the expenditures on the Canyon Ranch project were made in foreseeable reliance on the modified terms of the ground leases.

### 3. Damages Amount

In addition to questioning reliance and foreseeability of the expenditures, appellants argue that evidence of the amount of reliance damages was speculative. Appellants state that there was no evidence that appellees would have broken even on Tower II, noting that there was no financing in place, no final building plans, no permits, and no construction contract.

First, appellants argue that appellees failed to prove that they would have generated enough revenue from the project to recoup their expenses made in reliance on the ground leases. However, reliance damages are only awarded when "future gain cannot be measured with any reasonable degree of reliability." *Wartzman v. Hightower Productions, Ltd.,* 53 Md.App. 656, 456 A.2d 82 (1983). In *Wartzman,* we specifically held that in order to recover reliance damages, plaintiffs need not prove that a future business venture rendered impossible by the defendants' breach would have generated profits. *Id.* at 661–664, 456 A.2d 82. Instead, the impetus is on "the breaching party to prove any loss that the injured party would have suffered had the contract been performed." *Id.* at 663, 456 A.2d 82.

Appellees introduced legally sufficient evidence of reliance damages at trial to create a jury issue. Even minimal evidence, when given its greatest weight, can be sufficient to prove the elements of a plaintiff's case. Evidence indicated that appellants' failure to rectify the initial breach caused appellees' damages. At trial, William Foote, a certified public

accountant with experience as an auditor and financial consultant, testified as to the costs incurred for both towers. Mr. Foote analyzed all cost transactions by comparing entries on RSC's ledgers with vendor invoices, checks, or the ground leases themselves. Mr. Foote then traced payment of those costs to applicable bank statements. Finally, Mr. Foote verified that the cost was for the residential towers by establishing a criteria of words indicating that the cost was associated with the towers. If no specific word was associated with the cost, Mr. Foote interviewed RSC representatives to determine if the cost was in fact incurred for the residential towers. Mr. Foote stated that he did not include costs when he was unable to verify that the cost was actually incurred or paid for the residential towers. Mr. Foote also testified as to cost schedules he created that categorized costs by the specific vendor to which they were owed. Mr. Foote testified that he tested approximately 99 percent of the costs potentially related to the residential towers even though in a normal audit an accountant only looks at approximately 50 percent of the costs. All invoices, checks, and bank statements that tended to show that the expenses were incurred for the residential towers were admitted into evidence.

Although appellants argue that Mr. Foote did not testify as to whether appellees actually relied upon the ground leases in making all of the expenditures, the evidence presented to the jury was sufficient for it to make its own determination regarding appellees' reliance. For example, Plaintiff's Exhibit 250, which was the Tower II ledger, clearly delineated the vendor, date, description, and amount for each cost transaction. Mr. Foote also testified as to specific transactions and the costs associated with them. Appellants were free to, and in fact did, cross-examine Mr. Foote on his findings, including transactions that may have been incurred prior to the formation of the ground leases and transactions that may have been spent in reliance on other parts of the development. Appellees presented sufficient evidence to create a jury question as to reliance damages.

#### 4. *Joint and Several Liability*

Appellants contend the judgments must be vacated because there is no basis for joint and several liability. Appellants begin by arguing that it was unduly prejudicial for the court to permit the filing of the third amended complaint, which included the claim for joint and several liability.

Appellants then argue that the circuit court should have granted their motion for judgment because (1) the evidence was legally insufficient to support a finding of third party beneficiary status and (2) the presence of covenants running with the land in the leases was not a valid legal basis for joint and several liability. Appellees argue that the leases, projections, and testimony all indicated that the two towers were inextricably intertwined and each was intended to benefit the other. Alternatively, appellees maintain that there was a uniform plan of development, and in that situation, any property owner in the development can enforce covenants running with the land.

In reviewing the grant of a pre-trial amendment, the appellate court uses an abuse of discretion standard. *Robertson v. Davis,* 271 Md. 708, 710, 319 A.2d 816 (1974). In reviewing the denial of a motion for judgment or judgment notwithstanding the verdict, we review questions of law *de novo. Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175 (2006). For questions of fact, we must affirm the trial court and uphold the jury's verdict as long as it is supported by legally sufficient evidence. Evidence is legally sufficient if there is "some evidence, including all inferences that may permissibly be drawn therefrom, that, if believed and if given maximum weight, could logically establish all the elements necessary to prove" plaintiff's case. *Starke v. Starke,* 134 Md.App. 663, 678–79, 761 A.2d 355 (2000).

#### A. *Third Amended Complaint*

Here, there was no showing of prejudice caused by the timing of the amendment, and the circuit court did not abuse its discretion. "Amendments shall be freely allowed when

justice so permits." Md. Rule 2–341(c). Leave of court for amendments should only be denied when the amendment would result in prejudice to the opposing party or undue delay. *Robertson*, 271 Md. at 710, 319 A.2d 816.

The circuit court granted leave to amend on February 16, 2010, 13 days before the start of the trial. Nevertheless, appellants fail to cite any type of prejudice except for the fact that the jury ultimately found appellants jointly and severally liable. The prejudicial nature of the jury's verdict does not stem from the late amendment itself but rather from the evidence and the court's instructions to the jury. The circuit court did not abuse its discretion in granting leave to amend.

### B. *Third Party Beneficiary Status*

With respect to third party beneficiary liability, appellants argue that appellees failed to produce any evidence that each appellee was intended to be a third party beneficiary of the other's lease. In *Mackubin v. Curtiss–Wright Corp.*, the Court of Appeals held that a third party could enforce a contract made "expressly for the benefit of either a donee beneficiary or a creditor beneficiary." 190 Md. 52, 56, 57 A.2d 318 (1948). The Court defined

> (1) a "donee" beneficiary as one "where it appears that the purpose of the promisee in obtaining the promise of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary" and
>
> (2) a "creditor" beneficiary as one "where no purpose to make a gift appears and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee . . . ."

*Id.* at 56–57, 57 A.2d 318 (citing Restatement of Contracts § 133). The Court explained that a third party beneficiary cannot enforce a contract merely because "the contract may operate to his benefit." *Id.* at 58, 57 A.2d 318. In that case, the third party is referred to as an "incidental" beneficiary.

Instead, "[i]t must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise." *Id.*

Maryland now follows the rule set out in Restatement (Second) of Contracts § 302 (1981), which states that:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*See Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 969 A.2d 284 (2009) (applying Restatement (Second) of Contracts § 302 to a contract dispute as opposed to Restatement of Contracts § 133). The change made in the Second Restatement "was not one of substance, but only of terminology." *Id.* at 263, 969 A.2d 284; Restatement (Second) of Contracts § 302 Rptrs. Notes (1981). Nevertheless, the Second Restatement also recognizes that a person who does not qualify as an intended beneficiary under subsection (1)(a) or (b) may qualify "if the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." Restatement (Second) of Contracts § 302 cmt. d (1981).

First, the preliminary requirement that "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties" is not met here. The primary method of determining the intention of the parties to a contract is to look at the language in the contract. *Volcjak v. Washington County Hosp. Ass'n.*, 124 Md.App. 481, 509, 723 A.2d 463 (1999). When determining third party

beneficiary status, "the controlling issue is whether the contract's terms, in light of the surrounding circumstances, reveal an intent to make the promise to the third party in fact if not in form." *College of Notre Dame of Maryland, Inc. v. Morabito Consultants, Inc.,* 132 Md.App. 158, 179, 752 A.2d 265 (2000).

■■■ In this case, the parties are suing for damages based on a violation of the estoppel certificate provision in each ground lease. The language of the estoppel certificate provisions themselves do not explicitly mention or contemplate the right of a non-party to the contract to request and receive estoppel certificates. Further, the language of the entire lease does not explicitly mention or contemplate the right of a non-party to the contract to enforce the provisions of the lease.

Appellees argue that the surrounding circumstances were sufficient to create a question of fact because the leases were executed simultaneously; the initial landlords were the same (Camalier Limited Partnership and Davis Brothers Montgomery Farm Limited Partnership); the project worked only if both towers were built; and cross easements between the two parcels were granted. However, those similarities do not demonstrate that the parties intended to benefit each other by entering into the ground leases. Each appellee obtained a benefit from the enforcement of the other's ground lease and the general development of the property, but no intention can be read into the ground leases to confer any specific claim or right upon the other.

Furthermore, even if there was a preliminary demonstration of intent for the non-contractual appellee to have standing to enforce the estoppel certificate provisions in the ground leases, appellees are neither creditor nor donee beneficiaries nor their progeny under § 302(1)(a) or (b). There is no evidence of any sort of outstanding monetary obligation between appellees. There is also no evidence that the promisees intended to give the beneficiaries the benefit of the promised performances. *See Weems v. Nanticoke Homes, Inc.,* 37 Md.App. 544,

556, 378 A.2d 190 (1977) (holding that even if a close relationship was contemplated between a party and its subcontractor, there was no evidence that the contractor intended to benefit the subcontractor when it contracted with the plaintiff that the plaintiff was to bear the burden of providing insurance). In entering into the ground leases, and specifically the estoppel certificate provisions, each appellee intended to be able to enforce its specific right to obtain an estoppel certificate. There is no evidence that each appellee intended to allow others to enforce its right to obtain an estoppel certificate, because an estoppel certificate for that specific parcel would be useless to any other party. Appellees are not intended beneficiaries of each other's ground leases.

### C. *Covenants Running with the Land*

■■■ Additionally, the parties cannot be held jointly and severally liable because of any covenants running with the land. Appellants implicitly concede that the terms of the leases are covenants running with the land but argue that only an assignee can enforce the covenants, not an adjoining landholder. Appellees argue that the covenants were part of a uniform plan of development, and in that situation, a covenant can be enforced by a property owner against another neighboring property owner.

■■■ Because appellants concede that the terms of the lease are covenants running with the land, the only question presented on appeal is who may enforce those covenants. Generally, a covenant running with the land may only be enforced by the covenantee and its representatives, heirs, devisees, and assignees. *See Chevy Chase Village v. Jaggers,* 261 Md. 309, 314–15, 275 A.2d 167 (1971). In other words, a covenant that runs with the land may only be enforced by the covenanting parties and those in privity.

Appellees state that the covenants here were part of a uniform plan of development, and thus, the terms of each ground lease could be enforced against the burdened party (landlords) by a party not in privity to the original ground

lease. Appellees assert that because there was a uniform plan of development, the Tower II tenants could enforce the terms of the Tower I lease against appellants and vice versa.

We recognize that, under the law for uniform plans of development, a restrictive covenant may be enforced by one property owner against a neighboring property owner even if those two parties are not in privity with one another. *See Lindner v. Woytowitz*, 37 Md.App. 652, 378 A.2d 212 (1977) (allowing one neighbor to enforce a restrictive covenant against another neighbor where the neighbors shared a common grantor who adopted the restrictive covenants with the intent to create a uniform plan of development). Such an equitable servitude only applies to restrictive covenants, however. Here, appellant-landlords agreed to an affirmative covenant in the ground leases; namely, they promised to provide estoppel certificates to appellee-tenants. We are aware of no cases in Maryland that extend the equitable doctrine of uniform plan of development this far, and we decline to do so now.

Even if the uniform plan of development doctrine did apply to affirmative covenants made on behalf of the grantor of the property interest, appellees failed to provide sufficient evidence of a uniform plan of development between the two parcels in this case. To establish a uniform plan of development, it must be shown that a common grantor intended to adopt a restrictive covenant as part of a uniform general scheme or plan of development that will affect all the land granted by the grantor, even if granted to several different parties. *See Club Manor, Inc. v. Oheb Shalom Congregation*, 211 Md. 465, 476, 128 A.2d 405 (1957) ("[w]here there is a uniform plan of development and a restrictive covenant has been adopted as part of a general scheme, such a covenant may be enforced at the suit of a neighboring owner aggrieved by its breach."). For the same reasons that each appellee cannot enforce the other contract based on a third party beneficiary theory, there is no evidence that appellant-landlords entered into the covenant regarding estoppel certificates with the intent to further a uniform plan of development. The

Tower II appellee may not enforce the terms of the Tower I lease and vice versa under the uniform plan of development doctrine.

Consequently, as a matter of law, appellants can not be held jointly and severally liable. The circuit court below erred in submitting the issue to the jury, in giving the instructions to the jury regarding third party beneficiary status and covenants, and in including the joint and several liability questions on the verdict sheet. A new trial is not required based on this issue alone, however, because the jury awarded a finite amount of damages against each appellant: $32,696,612 against Tower I appellants and $3,653,627 against Tower II appellants. We remand to the circuit court with instructions to correct the judgment.

### 5. Evidentiary Issues

Appellants assert that the circuit court erred in 1) barring the testimony of appellants' expert witness Larry Johnson; 2) admitting evidence relating to appellants' intent and motivation to breach; and 3) admitting evidence allegedly protected by the attorney-client privilege.

We review the admission or exclusion of evidence, including expert testimony, for an abuse of discretion. *See Brown v. Contemporary OB/GYN Assocs.*, 143 Md.App. 199, 252, 794 A.2d 669 (2002). There is an abuse of discretion "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312, 701 A.2d 110 (1997) (citations omitted). We will not find error unless the party is prejudiced by the ruling, and a timely objection or motion was made specifying the grounds of the objection or the substance of excluded evidence was proffered to the court. Md. Rule 5–103.

### A. Expert Testimony of Larry Johnson

Appellants discuss the court's grant of appellees' motion in limine to exclude evidence relating to post-breach

market conditions, but then appear to challenge all evidentiary rulings excluding testimony by appellants' experts, most notably Larry Johnson, an accountant.

Appellees argue that the circuit court barred the testimony of Mr. Johnson because of a lack of qualifications and untimely disclosure. Appellees explain that the issue arose because the court had excluded testimony by appellants' real estate experts because they relied on post–2006 market conditions, and when the court ruled that evidence inadmissible, appellants sought to re-tool Mr. Johnson. Appellees observe that the court offered to hear Mr. Johnson's testimony out of the presence of the jury and make a final ruling, but appellants declined, admitting that Mr. Johnson had no expertise in making real estate projections. Appellees add that Mr. Johnson's opinions were untimely.

In deciding whether to admit expert testimony, the trial court will analyze "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." Md. Rule 5–702. Again, we review this determination for an abuse of discretion.

The circuit court did not abuse its discretion. The circuit court was presented with the contested evidence by a lengthy offer of proof. The circuit court found that Mr. Johnson was mainly being offered to attack the assumptions relied upon by Mr. Wright, an accountant. The assumptions Mr. Wright relied upon consisted of the testimony by Mr. Leisch, the plaintiff's real estate expert. Mr. Johnson had no expertise, training, or education in real estate or in making real estate projections. The circuit court stated that Mr. Johnson's testimony would be admissible if he attacked Mr. Wright's methodology of computing the various numbers and assumptions to come to a conclusion as to damages, but instead found that Mr. Johnson would be impermissibly attacking the underlying assumptions that accountants regularly rely upon but that are created by experts in other fields. The circuit court also

stated that the defense could have brought in a real estate expert to attack Mr. Leisch's testimony, but that Mr. Johnson, as a forensic accountant, was unqualified to do so. The circuit court did not abuse its discretion in barring the testimony of Mr. Johnson regarding facts and information upon which he had no expertise.

### B. *Intent and Motivation Evidence*

■■■ Appellants appeal the denial of a motion in limine to exclude evidence of facts prior to April 2007, including their motivation to breach and communications with counsel, except those relating to causation and damages. Appellants argue that, at trial, they did not challenge the April 2007 ruling of breach; thus, any evidence of motivation or bad conduct was irrelevant and prejudicial. Appellees argue that evidence of appellants' bad faith and intention to breach the leases was relevant to appellees' claim that appellants breached the implied covenant of good faith and fair dealing (included in the third amended complaint). Appellants put their intent to breach at issue, according to appellees, by arguing that appellants' blockage of the administrative approvals and their appeal of the April 2007 ruling could cause actionable damages only if done in bad faith. In addition, appellants asserted that they could not be held liable for damages accruing after they provided conditional estoppel certificates because they technically complied with the terms of the ground leases.

Appellants also appeal the grant of appellees' motion to exclude evidence relating to appellees' bad conduct prior to April 2007.[2] Appellants sought to introduce that evidence, they observe, not to re-litigate the finding of breach in the April 2007 judgment but rather to rebut appellees' assertion of bad behavior by appellants because it explained why appellants refused to execute estoppel certificates. Appellants suggest that the court permitted at least some of the conduct

---

2. Specifically, appellants wished to introduce evidence regarding alleged fraudulent misrepresentations made by appellees to appellants when asking for an extension of deadlines for the Canyon Ranch Project.

evidence as general background and because it was relevant to credibility. If that is the case, appellants argue, the court should have permitted conduct evidence as to all parties.

To reiterate, appellants acknowledged that the earlier summary judgment established that appellants had breached the leases in late 2006. At that point in time, appellees sought injunctive relief, requiring appellants to provide estoppel certificates to enable the project to go forward. After the entry of summary judgment, appellants supplied estoppel certificates which they asserted were in compliance with the leases, and therefore, they could not be held liable for damages accruing thereafter because they supplied the certificates and pursued their appellate rights in good faith. Appellees asserted that the estoppel certificates were conditional and worthless. By the time the summary judgment in the 2006 action was affirmed, the real estate market had deteriorated, and the project was no longer feasible. As a result of appellants's position that they had technically complied with the leases and could not be held liable for damages accruing thereafter, appellees filed their third amended complaint in which they alleged a continuing breach of the implied covenant of good faith and fair dealing. Based on this amendment, the circuit court admitted evidence of appellants' bad conduct and motivation, specifically, evidence supporting an inference that appellants wanted to derail the apartment development project because they wanted to obtain a better deal for development of the parcels.

It makes no difference whether we view the appellants' conduct in 2007 and thereafter as a continuation of the initial breach or a series of successive breaches. Based on the evidence, the result is the same. A jury could find that appellants' actions after the April 2007 judgment affected the amount of damages that appellees incurred, because as of April 2007, the appellees could have obtained financing for the development if they had timely received valid estoppel certificates.

Evidence of appellants' motivation and subjective intent surrounding the breach and subsequent tender of conditional estoppel certificates was relevant and probative of appellees' claim that appellants violated the implied covenant of good faith and fair dealing. *Parker v. Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521 (1992) (noting that a duty of good faith and fair dealing "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract"). By claiming that the tender of the conditional estoppel certificates was done in good faith while pursuing a good faith appeal, appellants put their intent at issue, and appellees had the right to demonstrate that appellants continued to breach the ground leases by acting in bad faith with the purpose of precluding the development from going forward. Under the circumstances, the circuit court judge did not abuse its discretion.

In contrast, any evidence of appellees' bad conduct leading to appellants' refusal to execute estoppel certificates was irrelevant. The actions of appellees that led to appellants breaching the contract did not make any fact in this damages action more or less probable. Any alleged fraudulent misrepresentation on behalf of the appellees took place prior to the breach in late 2006, and the circumstances of that breach have already been determined and affirmed on appeal. Appellees' conduct was already adjudged not to be a defense to the initial breach, and therefore, it was irrelevant to appellants' continuing breach. Appellees did not open the door to the admission of this evidence in the subsequent damages trial. Thus, the circuit court did not abuse its discretion in barring evidence of appellees' bad conduct while admitting evidence of appellants' bad conduct and motivations.

### C. *Attorney–Client Privilege*

Finally, appellants maintain that the court admitted evidence that was in violation of the attorney-client privilege. Appellees argue that appellants waived any privilege by relying on advice of counsel during the cross-examination of Mr. Davis and Mr. Chris Camalier, another representative of one

of the original defendants in the action, by appellees' counsel. Appellants assert they did not raise a reliance on advice of counsel defense. Appellees also point out that appellants assert a wholesale violation of the privilege without the necessary specificity as to rulings.

Under Maryland law, the attorney-client privilege "prevents the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice." *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 414, 718 A.2d 1129 (1998). The attorney-client privilege "withholds relevant information from the fact finder" and should be "narrowly construed." *Id.* The privilege should be applied "only when necessary to achieve its limited purpose of encouraging full and frank disclosure by the client to his or her attorney." *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'ship*, 100 Md.App. 441, 456, 641 A.2d 977 (1994).

The party asserting the privilege bears the burden of establishing whether it applies to evidence in the case. *E.I. du Pont de Nemours*, 351 Md. at 415, 718 A.2d 1129. A blanket assertion of the privilege's application is "extremely disfavored" and "ordinarily the privilege must be raised as to each record so that the court can rule with specificity." *Maxima Corp.*, 100 Md.App. at 457, 641 A.2d 977 (citations omitted).

In the brief and reply brief, appellants did not set forth the elements necessary for the attorney-client privilege to apply and did not identify or explain how specific rulings violated that privilege. *See State Roads Com. v. Halle*, 228 Md. 24, 32, 178 A.2d 319 (1962) ("[s]urely it is not incumbent upon this Court, merely because a point is mentioned as being objectionable at some point in a party's brief, to scan the entire record and ascertain if there be any ground, or grounds, to sustain the objectionable feature suggested"). Although appellants complain about the grant of discovery in regard to allegedly confidential documents, appellants appear to challenge only evidentiary rulings. It appears that appellants challenge the admission into evidence of the entire videotaped deposition of

Mr. Hensler, appellants' former attorney at Hogan & Hartson, including all exhibits to the deposition.

First, the entirety of Mr. Hensler's deposition is not privileged. During the deposition, Mr. Hensler discussed a variety of topics that were not within the scope of confidential communications by a client in order to secure legal advice, such as communication with appellants' new attorney regarding a potential malpractice claim and communications with opposing counsel regarding the estoppel certificates. Without proper identification by appellants in their brief as to specific testimony or exhibits that they contend are protected by the privilege, it is impossible to determine what evidence is being challenged as privileged information.

Second, most of the deposition exhibits are not even remotely related to a confidential communication with the client concerning legal advice. The exhibits identified by appellants include a letter from a Canyon Ranch representative to appellants, an internal Hogan & Hartson e-mail requesting a conflicts check, communications between Hogan & Hartson and its opposing counsel, illegible handwritten notes that appellants do not immediately identify in the brief as belonging to any attorney or client, and copies of the subpoena and deposition notice for Mr. Hensler. On their faces, these exhibits are not protected by the attorney-client privilege.

Several other exhibits contain discussions of client objectives and concerns, but appellants fail to demonstrate that those concerns were communicated confidentially and for the purpose of seeking legal advice. Appellants do specifically mention one document, an e-mail dated April 9, 2007 sent from Davis Camalier to an attorney at Hogan & Hartson. In this e-mail, Mr. Camalier states "[j]ust make sure you stop the bastards. Whichever way you choose to go. We need some leverage." The attorney was initially writing Mr. Camalier to inform him of what actions had been taken after the April 4, 2007 judgment, including the timing of filing an appeal with the Court of Special Appeals. It is questionable whether this particular statement is a protected communication because it

is not immediately apparent that it was made for the purpose of seeking further legal advice. Furthermore, as discussed below, appellants waived the attorney-client privilege as to this document by making the question of whether their pursuit of an appeal was done in good faith a central issue at trial.

In general, we cannot determine what specific evidence may be privileged because appellants did not meet their burden of identifying and proving the application of the privilege to specific evidence. Due to lack of specificity, to the extent that any of the exhibits are privileged, we cannot determine whether the court erred in concluding that appellants waived the privilege based on the court's conclusion that defense witnesses had relied on advice of counsel as a defense to the claim for damages post April 2007.

In Maryland, "[a] party waives his attorney-client privilege when the party relies on the advice of counsel as an element of his defense." *ST Sys. Corp. v. Maryland Nat'l Bank*, 112 Md.App. 20, 35, 684 A.2d 32 (1996). "[R]eliance on an attorney's advice may, in a civil action, negate wrongdoing where the advice has been based on a full disclosure of the relevant facts." *Manown v. Adams*, 89 Md.App. 503, 514, 598 A.2d 821 (1991) *vacated and remanded on other grounds by Adams v. Manown*, 328 Md. 463, 615 A.2d 611 (1992). Therefore, in those cases in which reliance on counsel may negate wrongdoing and the defendant raised that defense, the defendant waived the attorney-client privilege with respect to that matter. *Id.* at 515, 598 A.2d 821 ("[t]he requirement of full disclosure is imposed to prevent an advisee from using the defense as a shield when he or she has falsely omitted facts bearing upon the matter"). "Maryland law establishes that when a client, through his testimony, puts at issue a specific communication with his attorney, the attorney's testimony becomes admissible because the client has waived his privilege." *In re Nazarian*, 18 B.R. 143, 147 (Bankr.D.Md.1982) (holding that party waived attorney-client privilege when the party raised advice of counsel as a defense where such advice could negate the inference of fraudulent intent in a bankrupt-

cy action). *See also Fraidin v. Weitzman*, 93 Md.App. 168, 227, 611 A.2d 1046 (1992) ("[h]ad [the defendant's] defense been advice of counsel, full disclosure would have been required").

Thus, the question becomes whether appellants, as defendants, sufficiently raised reliance on counsel as a defense to waive attorney-client privilege. Appellants reason that reliance on counsel is only sufficiently raised to negate the attorney-client privilege when the defendant's intent is an element of the claim. Appellants also claim that the privilege is not waived when reliance on counsel is raised in response to a question on cross examination. Finally, appellants argue that the court justified an invasion of the attorney-client privilege in order to attack a witness' credibility and that such a justification is not allowed.

Appellants waived the attorney-client privilege during the testimony of Mr. Davis and the videotaped deposition of Chris Camalier that was played at trial. Mr. Davis was affiliated with the Davis Brothers Montgomery Farm Limited Partnership and Mr. Camalier was the representative of Camalier Limited Partnership, appellants' assignors and original defendants in this action. Both Mr. Davis and Mr. Camalier repeatedly referred to the advice of counsel to justify their actions during the pertinent time periods. For example, the attorney for appellees asked Mr. Camalier if he was aware that the continuing course of conduct of not providing unconditional estoppel certificates would result in a failure of financing for the RSC Towers. Mr. Camalier responded by stating that "[w]e were operating in good faith and operating pursuant to discussions with our attorney who felt we were doing nothing improper." Later, Mr. Camalier stated:

> We thought about it in that we sent the letter to our lawyers and asked them what, are we acting in good faith? Are we acting within our rights under the ground lease? So, to the extent, yes, we saw what Mr. Hoffman said in his letter but we did not make an independent analysis. We sent it to our lawyer. This is what they're stating. Are we

on solid ground, operating in good faith, which we were, and basically have we complied with the ground lease? We were advised, yes we were.

Mr. Davis also referred to the advice of counsel to explain why he refused to sign the estoppel certificates:

Q: Mr. Davis, is the statement in that letter that the reason you refused to sign the estoppel certificates was that you got negligent advice from Hogan and Hartson?

A: Yes.

Q: Is that a truthful statement?

A: Yes.

Mr. Davis also referred to the advice of counsel to avoid answering a question asked by appellees as to whether he knew that reserving all rights under the estoppel certificates would result in the failure of the project to go forward:

Q: Mr. Davis, will you answer my question? My question is this. When you signed that letter purporting to reserve all rights, you knew that assertion was totally inconsistent with the business purpose for which an estoppel certificate is requested?

A: We signed the estoppel certificate that the Judge ordered and once again, I did not draft this letter. It was drafted by an attorney. I did sign it and reserving all rights, I thought reserved the rights that we had under the documents as we went to the Court of Appeals.

Rather than creating a strict test that limits the waiver of the attorney-client privilege to certain defenses raised in certain actions at certain times for certain reasons, Maryland courts use a more flexible test, examining how much the defendant actually put the advice of counsel at issue and whether it was truly an attempt to negate an accusation of wrongdoing.

For example, in *Harrison v. State,* the Court of Appeals opined at length as to when a criminal defendant waives his attorney-client privilege and whether it is at all possible for a defendant to waive the privilege during cross examination.

276 Md. 122, 345 A.2d 830 (1975). The Court did not express-
ly reject the notion of waiver based on answers given during
cross-examination, and noted that the important inquiry is
whether the client's testimony was voluntary; whether the
defendant expressed an intent to waive by word, act, or
omission; and whether waiver would promote fairness and
consistency. *Id.* at 137–38, 345 A.2d 830. The Court cited a
number of cases in which various courts found a waiver of the
attorney-client privilege based upon answers given during
cross-examination that were both "substantive and detailed."
*Id.* at 138–40, 345 A.2d 830. The Court also cited favorably a
number of cases that held that the attorney-client privilege
was not waived when defendants discussed confidential com-
munications after being explicitly asked direct questions on
cross examination such as "What did you tell your attorney?"
*Id.* at 140–50, 345 A.2d 830. In *Harrison,* the Court held that
the defendant's statement "I told my lawyer all about it" on
cross examination did not constitute a waiver of his attorney-
client privilege such that the crossing attorney could ask
further questions about what he told his attorney and when.
*Id.* at 150–51, 345 A.2d 830. The Court reasoned that "[i]t
was a general statement which did not disclose, or purport to
disclose what words were used—or what the conversation
was—nothing which was confidential was thereby revealed."
*Id.* at 151, 345 A.2d 830.

Similarly, in *Haley v. State,* the Court of Appeals held that
the defendant did not waive his attorney client privilege when
defense counsel stated that he just received pertinent informa-
tion from the defendant the night before. 398 Md. 106, 919
A.2d 1200 (2007). Thus, the Court held that prosecutor should
not have been allowed to cross examine the defendant about
his discussions with defense counsel. *Id.* at 128, 919 A.2d
1200.

In *Fraidin v. Weitzman,* this Court held that a civil defen-
dant did not waive the attorney-client privilege when the
defendant asserted that he relied on advice of counsel for an
issue that was uncontroverted rather than as a defense to
liability for wrongdoing. 93 Md.App. 168, 611 A.2d 1046

(1992). In *Fraidin,* the defendant's opening statement and testimony stated that his attorneys advised him that it was legally permissible to settle with an opposing party. *Id.* at 227, 611 A.2d 1046. However, whether it was legal to settle with the party was not at issue in the case; instead, the issue in the case was based on the defendant's conduct in inducing the opposing party to discharge their counsel as a condition of settlement. *Id.* at 227–28, 611 A.2d 1046. Therefore, because the defendant did not directly assert an advice of counsel defense to the claim for which he was potentially liable, he did not waive the attorney-client privilege. *Id.*

Similarly, in *ST Sys. Corp. v. Maryland Nat'l Bank,* this Court found that the defendants did not waive the attorney-client privilege by invoking an advice of counsel defense even though the defendant stated that some of the reasons for their actions were based on advice of counsel. 112 Md.App. 20, 35–36, 684 A.2d 32 (1996). In that case, the defendants also testified as to the specific reasons for their actions; thus, this Court reasoned that they were not attempting to hide behind the attorney client privilege while simultaneously using it as an explanation for their actions. *Id.*

Here, appellants' position was that they were not liable for damages caused by failing to provide unconditional estoppel certificates after summary judgment was entered in the 2006 action. They asserted that they complied with the leases by providing estoppel certificates, albeit conditional, and they took that position in good faith in reliance on counsel. By claiming that they were following the advice of their attorneys in refusing to sign the estoppel certificates and later reserving all of their rights under the estoppel certificates, appellants opened the door for appellees to prove otherwise. This case is not similar to *Fraidin,* a case in which the issue was uncontroverted or otherwise irrelevant to the disposition of the action. Here, there was an issue of continuing breach and appellants took the position that their state of mind and intent was relevant. This case is also not similar to *Harrison* or the cases cited therein, because appellants were sophisticated investors who used advice of counsel to justify specific actions

before appellees' attorneys attempted to ask what counsel had specifically told them.[3] Consequently, we perceive no reversible error.

### 6. Jury Instructions

Appellants contend the circuit court erred in its instructions to the jury by: (1) refusing to give an instruction on nominal damages; (2) giving instructions on third party beneficiary status, covenants running with the land, and uniform plan of development; (3) refusing to give an instruction on causation in the form requested by appellants; (4) refusing to give an instruction on reasonable certainty in the form requested by appellants; (5) refusing to give an instruction on collateral lost profits; (6) refusing to give an instruction relating to actual market performance; (7) refusing to give appellants' requested instruction relating to lost profits and reliance damages as alternative theories; (8) giving an instruction on the duty of good faith and fair dealing and, in the alternative, refusing to give appellants' requested instruction; (9) refusing to instruct that appellees were required to prove that the project would have been profitable; and (10) refusing to instruct that, to recover for reliance damages, appellees had to prove that they would have generated sufficient revenue to recoup all project costs.

In reviewing the propriety of jury instructions, the appellate court "must determine whether the requested instruction was a correct exposition of the law, whether that law

---

**3.** Appellants reason that, in "sword and shield" cases, waiver only applies to a plaintiff, not a defendant. Appellants cite *Ehrlich v. Grove*, which held that a civil defendant does not waive attorney-client privilege by producing documents similar to the ones for which the defendant is asserting the privilege. 396 Md. 550, 574 n. 14, 914 A.2d 783 (2007). In *Ehrlich*, the Court of Appeals simply noted that the express and implied waiver principle, which states that a plaintiff cannot simultaneously use privileged information as a sword to assert his claim and deny discovery to a defendant on the basis of the privilege, only applies to plaintiffs, not defendants. *Id.* The Court also noted that this rule is generally used for professional malpractice cases. *Id.See also Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 692–93, 756 A.2d 526 (2000). This is not a sword and shield case, however.

was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." *Wegad v. Howard St. Jewelers,* 326 Md. 409, 414, 605 A.2d 123 (1992). The complaining party must demonstrate both prejudice and error from the grant of or refusal to provide a jury instruction. *Farley v. Allstate Ins. Co.,* 355 Md. 34, 47, 733 A.2d 1014 (1999). The instructions regarding joint and several liability were inapplicable in light of the evidence before the jury, as addressed *supra.* The refusal to provide instructions regarding actual market performance and whether the project must be profitable to recover lost profit and reliance damages was correct, as addressed in the sections *supra.* The other jury instructions are addressed below.

### A. *Nominal Damages*

First, appellants argue that the circuit court should not have refused to provide a jury instruction establishing that the jury could simply award appellees $1.00 in damages. However, a nominal damages instruction is only applicable when the plaintiffs have failed to establish any evidence of damages. *Mason v. Wrightson,* 205 Md. 481, 489, 109 A.2d 128 (1954). Here, appellees introduced evidence of damages; therefore, the nominal damages instruction was properly rejected.

### B. *Causation*

Second, appellants assert that the circuit court erred in not including the following in its jury instruction on causation: "[t]he defendants' conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even without the defendant[s'] conduct." Instead, the jury instruction provided that "[p]roximate cause exists when the breach is a substantial factor in causing the damage." In support of its interpretation, appellants rely on a negligence case, *Peterson v. Underwood,* 258 Md. 9, 264 A.2d 851 (1970), that does not address causation or the definition of "substantial factor" in a breach of contract case. The instruc-

tion provided was correct, applicable, and fairly covered the substance of the requested instruction. Appellants did not meet their burden of proving reversible error.

## C. *Reasonable Certainty*

Third, appellants contend that it was error not to include their jury instruction on the reasonable certainty requirement for contract damages, which stated in pertinent part that "[t]o show reasonable certainty, a plaintiff must show both the likelihood and the probable amount of the damages it suffered as a result of a defendant's breach." Instead, the court's instruction included language from *M & R Contractors* describing in part some of the recent modifications of the standard of proof for lost profits damages. 215 Md. at 349, 138 A.2d 350. This instruction was a correct exposition of the law, and helped to clarify the standard of proof for lost profits damages beyond what was offered by the defendant-appellants. Appellants have failed to establish reversible error.

## D. *Collateral Lost Profits*

Fourth, appellants allege that the circuit court erred in not including a statement that the reasonable certainty requirement is "strictly applied" for collateral lost profits damages. This Court has held that the requirements of proximate causation, foreseeability, and reasonable certainty for proving lost profits damages are to be "strictly applied" in the case of collateral lost profits. *See Hoang,* 177 Md.App. at 610, 936 A.2d 915. However, *Hoang* was referring to the legal sufficiency of the evidence in determining whether the issue should go to the jury in the first place, not espousing that the jury had to be so instructed. Furthermore, appellants do not assert any prejudice that could have arisen from the lack of a "strict application" instruction. Appellants have failed to establish reversible error.

## E. *Lost Profits and Reliance Damages*
## *as Alternative Theories*

Fifth, appellants assert that the circuit court erred in refusing to instruct the jury that reliance damages were an alterna-

tive in the event that lost profit damages were not reasonably certain. Instead, the circuit court simply instructed the jury that "[t]he plaintiffs, as an alternative, may seek reliance damages" before explaining the definition of reliance damages. This jury instruction is sufficient, and appellants fail to establish any prejudice as the parties seemingly agree that the jury awarded lost profits damages for Tower I and reliance damages for Tower II.

### F. *Duty of Good Faith and Fair Dealing*

Finally, appellants allege that the circuit court erred in declining to provide appellants' requested jury instruction on the implied duty of good faith and fair dealing. Appellants requested the following instruction: "[t]he implied duty of good faith and fair dealing does not change the terms of the contract. It does not obligate a party to take affirmative actions that the party is not required to take under the contract." The court's instruction provided in part that "[t]he fact that a party acts in compliance with the literal and technical terms of a contract does not absolve it of liability where it failed to perform in accordance with its duties of good faith and fair dealing." Appellants contend that this instruction was erroneous because it came from a case applying New Jersey law. *See Electronics Store Inc. v. Cellco P'ship*, 127 Md.App. 385, 401, 732 A.2d 980 (1999). Regardless of origin, this language does not contradict Maryland law. The implied duty of good faith and fair dealing "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Parker v. Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521 (1992). Therefore, the instruction means that, even though a party may comply with the technical terms of a contract, it may still be liable if it acts in a way to prevent the other party from performing his obligations under the contract.

Furthermore, there was never any contention that appellants should have taken an affirmative action that is not explicitly required under the contract. Instead, the issue was whether appellants continually violated the implied duty of

good faith and fair dealing by failing to provide unconditional estoppel certificates. Appellants have failed to establish reversible error.

### 7. New Trial Judge

In light of our disposition of the other issues in this case, we need not consider whether the case should be assigned to a new trial judge.

### 8. Attorneys' Fees and Costs

Appellants contend that, if we reverse the judgment, we must reverse the attorneys' fee award. As is clear, we are not doing so. Appellants also contend the court abused its discretion as to the amount of fees awarded, but offers virtually no argument in support of that contention.

The determination of the award of attorneys' fees "lies within the sound discretion of the trial judge and will not be overturned unless clearly erroneous." *Dent v. Simmons,* 61 Md.App. 122, 127, 485 A.2d 270 (1985) (citations omitted). Appellees provided ample evidence for its claim of expenses and appellants are unable to establish any abuse of discretion.

**CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH INSTRUCTIONS TO CORRECT THE JUDGMENT TO ENTER JUDGMENT IN FAVOR OF RSC TOWER I, LLC SOLELY AGAINST CR–RSC TOWER I, LLC AND SECOND CR–RSC TOWER I, LLC AND JUDGMENT IN FAVOR OF RSC TOWER II SOLELY AGAINST CR–RSC TOWER II, LLC AND SECOND CR–RSC TOWER II, LLC. JUDGMENTS OTHERWISE AFFIRMED. COSTS TO BE PAID 90 PERCENT BY APPELLANTS, IN EQUAL SHARES, AND 10 PERCENT BY APPELLEES, IN EQUAL SHARES.**